UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DINO LOREN SMITH,

           Petitioner,

    v.

GARY SWARTHOUT,

           Respondent.

Case No. 09-CV-05602-LHK

**ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 15

Petitioner Dino Loren Smith ("Petitioner") petitions for writ of habeas corpus to vacate his convictions and sentence for robbery and other crimes arising from a 2003 jewel heist in San Francisco. Petitioner raises nine claims of error. Respondent Gary Swarthout ("Respondent") has filed an answer. Having considered the parties' briefing, the relevant law, and the record in this case, the Court DENIES Petitioner's amended petition.

# I. BACKGROUND

## A. Factual Background

Federal courts reviewing habeas petitions are instructed to presume that the factual determinations of state courts are correct unless that presumption is rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003). Accordingly, the factual background provided by the California Court of Appeal on Petitioner's direct appeal, *People v. Smith*, 2007 WL 4447308 (Cal. Ct. App. Dec. 20, 2007), will serve as the factual framework for this habeas review.

### 1. The Lang's Robbery

The facts are as follows:

On April 7, 2003, [Erin] Beeghly was working as a staff gemologist for Lang's [Antique and Estate Jewelry], located at 323 Sutter Street in San Francisco. Just before 9:30 a.m., Beeghly and fellow employee [Richard] Frye arrived at Lang's to open the store. As Beeghly entered a back bathroom to change her clothes, two men armed with handguns jumped out of the bathroom, located near the store's safes. While one of the men held a gun to Beeghly's head, the other went upstairs to get Frye. Frye identified appellant as the man who pointed a gun at him, then held a gun at Frye's back and ordered him into the back room. The other man then ordered Frye to open the safes, and Frye opened two of the three safes. Once inside the room with the safes, Frye complied with the order not to look at appellant. *Smith*, at *1.

The store's doorbell rang, and Beeghly was held at gunpoint while Frye was ordered to answer the door for [Miranda] Gonsalves, Lang's bookkeeper. As Gonsalves proceeded upstairs to her office, a man in a ski mask and armed with a handgun ordered her into the back room where Frye was attempting to open the safes. Thereafter, store manager [Suzanne] Martinez rang the store's doorbell, Frye let her in and she and Frye entered the back room. Martinez complied with the robbers' orders to open the third safe. *Id.* at *2.

While Gonsalves was in the back room with the two robbers, she noticed a shadow moving around inside the hole cut in the back wall, "like there might have been another person back there." She could not tell whether the person was male or female, or their race. *Id.*

The robbers took approximately $4,472,000 in jewelry from the store's safes. However, they left behind jewelry items that the store's customers had brought to the store to be repaired. After securing the store employees' hands, feet and mouths with duct tape and plastic ties, the robbers left the store through a hole cut in the wall of the back room which adjoined a vacant restaurant at One Tillman Place. *Id.*

The day after the robbery, Frey[1] was shown pictures by police and identified a photo of appellant as the person who robbed him. Frey told police the person had certain facial features similar to those of Jerry Rice. At trial Frey was 'very certain' that the person in the picture was the person who robbed him. In February 2003, the defense

---

[1] At this juncture in the Court of Appeal's recitation of the facts, the Court of Appeal shifts to referring to Frye as "Frey."

investigator showed Frey a series of photographs. Frey initialed a photo of Jerry Rice, which had features similar to those of Frey's robber. However, Frey refused to sign the admonition form because he felt he was being tricked by being shown a photo of Jerry Rice. Frey denied writing on the admonition form for the photo, "number 14 is the guy I saw on the stairs." *Id.* at 3–4.

Several victims told police they heard the two robbers talking on a walkie talkie while inside the store to a female "dispatcher" located outside. The female appeared to be reminding them of the time and "calling time." A security video from a nearby clothing store taken at 9:48 a.m. on the morning in question depicted four men coming out of the back side of Lang's, one of whom was carrying a large bag. Police discovered fingerprints belonging to Troy [Smith] (appellant's brother) and [George] Turner on newspaper and posterboard found at the crime scene. In June 2003, Turner was arrested in a San Francisco motel in possession of approximately $650,000 in jewelry taken from Lang's. *Id.* at 4.

In June 2004, police arrested appellant outside a New York City subway station. At first appellant claimed to be "Brandal Platt" and had identification in that name. Subsequently, appellant told police he had not been involved in the Lang's robbery but had "given advice and helped to plan the robbery." He then told police that Lang's owner, Mark Zimmelman, approached him in late 2002 and asked him if he and his brother Troy wanted to earn $1.0 to $2.0 million dollars. Appellant said he and Zimmelman planned the Lang's robbery over a five-month period. Appellant also told police he was afraid of Zimmelman "because of the people [Zimmelman] knew" who could hurt him. Appellant admitted to police that two parking tickets issued to his car in January 2003 within a block of Lang's occurred while he was meeting with Zimmelman. Appellant told police he knew there was an arrest warrant for him in California. *Id.*

Beginning in August 2003, Brian Boucher shared a New York City apartment with appellant, who identified himself to Boucher as "John Williams." In June 2004, appellant left the apartment without notice. Thereafter, in appellant's room, Boucher found a laptop computer which contained the sign-in name "Dino Smith." After discovering that appellant was connected to a San Francisco "burglary," Boucher contacted San Francisco police. A forensics examination of the laptop revealed internet searches between April 8 and 13, 2003, for crimes in San Francisco in the profile of "Dino Smith." In addition, a letter on the computer stated, "Why did I even give MZ the fucking time of day. I know, the money, right?" A document found in a folder retrieved from a search of appellant's bedroom in the New York City apartment dated a month before the robbery stated "meet" "with" "MZ again [????]" Also in the folder was an article from the April 19, 2003 San Francisco Chronicle headlined, "*Three Men Sought as Suspects in $10 Million SF Heist.*" *Id.* at *3.

## 2. Petitioner's Trial

On March 8, 2005, the People of the State of California charged Petitioner with the

following crimes: (1) four counts of second degree robbery; (2) two counts of kidnapping; (3) four counts of false imprisonment; (4) two counts of commercial burglary; (5) one count of being an ex-felon in possession of a firearm; and (6) one count of conspiracy to commit robbery. ECF No. 50, CT 59–68. The prosecution alleged that Petitioner was subject to sentencing enhancements for excessive taking of funds pursuant to California Penal Code § 12022.6(a)(4), *id.* at 59–62, and personal use of a firearm pursuant to California Penal Code §§ 12022.5, 12022.53(b). CT 59–65. Further, the prosecution alleged that Petitioner had prior convictions for first degree robbery. CT 69–70. The prosecution sought an upper-term sentence based on those aggravating factors. CT 123.

On March 9, 2005, Petitioner filed a motion for pretrial discovery of the personnel records of Inspector Daniel Gardner and Lieutenant Daniel Leydon, both of the San Francisco Police Department ("SFPD"), pursuant to *Pitchess v. Superior Court of L.A. County*, 11 Cal. 3d 531 (1974). CT 72. On March 10, 2005, the State also filed a *Pitchess* motion for discovery of Gardner's and Leydon's personnel records. CT 80. Although the record reveals no SFPD response, Petitioner and Respondent agree that SFPD did not produce the Gardner records before trial. ECF No. 15 ("Pet.") at 55; ECF No. 32 ("Ans.") at 13.

On April 22, 2005, Petitioner filed a motion in limine to exclude Petitioner's statements to Leydon and Gardner after his June 2004 arrest in New York. CT 281. Petitioner contended that he had not voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). CT 283. On May 5, 2005, the trial court held an evidentiary hearing on Petitioner's *Miranda* motion. RT 215. Leydon and Gardner testified, and Petitioner's counsel cross-examined them. The trial court denied Petitioner's *Miranda* motion because the SFPD officers "indicated under oath that [Petitioner] did talk to them [and] that [Petitioner] did not invoke the right to an attorney," and Petitioner offered "no evidence to the contrary." RT 254–55.

Petitioner went to trial on May 16, 2005, and jury deliberations began on May 31, 2005. CT 392. During deliberations, the jury sent several questions to the trial court regarding the jury instructions. *See* CT 511, 513, 515, 517, 521. The trial court responded to each question. CT

512, 514, 516, 518, 522.

On June 3, 2005, the jury convicted Petitioner of three counts of robbery, three counts of false imprisonment, one count of burglary, and one count of conspiracy. ECF No. 17-1, Ex. 41, CT 533. The jury found Petitioner not guilty of the robbery and false imprisonment counts against one Lang's employee, Martinez, CT 536, 540, and not guilty of one count of burglary. CT 544. The jury also found that the robbery involved excessive taking pursuant to California Penal Code § 12022.6(a)(4). CT 533. However, the jury found not true the prosecution's allegations that Petitioner used a firearm during the commission of the crimes. *See, e.g.*, CT 539, 541.

The trial court then moved to a second phase of the trial: whether the alleged aggravating circumstances were true. RT 1612. Before closing arguments in the second phase of the trial, Petitioner's counsel, Jonathan Rutledge, stated, "Your Honor, Mr. Smith requests that he be allowed to argue this portion of the case to the jury, himself." RT 1639. The trial court denied the request: "All right, I have denied that request. I think it's either Mr. Rutledge is the attorney, or he isn't. He can't pick and choose." *Id.*

During the second phase of the trial, the jury found that Petitioner had suffered three prior robbery convictions. CT 558-560. The jury found not true the allegations that (1) the Lang's heist involved great bodily harm; (2) Petitioner occupied a position of leadership in the scheme; and (3) the heist was "carried out with planning, sophistication or professionalism." CT 561-563. The jury found true the allegation that the Lang's heist involved a taking of at least $4 million. CT 564.

Shortly after the trial, Rutledge, Petitioner's counsel, became ill and withdrew. ECF No. 15-1, Declaration of Jonathan M. Rutledge ("Rutledge Decl.") ¶ 7. Janice Lagerlof represented Petitioner for post-trial and sentencing purposes. CT 588. On October 14, 2005, Petitioner filed a motion for a new trial. CT 592.

On November 10, 2005, the trial court denied Petitioner's motion for a new trial and sentenced Petitioner to 23 years in prison. CT 681–683. The trial court first struck two strikes that Petitioner had received for prior convictions. *Id.* at 681; *see also* CT 730 (sentencing

5

transcript). The trial court imposed five-year, upper term sentences on Count 1 (for robbery against Frey) and on Count 13 (for conspiracy to commit robbery). *Id.* at 682. The trial court concluded that an aggravated, upper term sentence was warranted based on "the fact that the crime was committed with great planning and sophistication," the jury's excessive taking finding, and Petitioner's "extensive prior prison record." *Id.* at 731–32. The trial court also ordered Petitioner to pay over $4 million in restitution to Lang's. *Id.* at 733.

**B. Post-Sentencing Proceedings**

**1. Direct Appeal**

After sentencing, Petitioner retained new counsel, Geri Lynn Green. Pet. at 8. On December 5, 2006, Petitioner appealed his conviction and sentence to the California Court of Appeal. ECF Nos. 34-38 & 34-39. In that appeal, Petitioner raised five claims: (1) the trial court erred by denying Petitioner's *Miranda* motion to suppress Petitioner's June 2004 statements to Leydon and Gardner; (2) substantial evidence did not support Petitioner's convictions; (3) the trial court failed to properly instruct the jury when responding to the questions the jury posed during deliberations; (4) the trial court improperly denied Petitioner's request to argue a portion of the case under *Faretta v. California*, 422 U.S. 806 (1975); and (5) the trial court erroneously relied on certain aggravating factors to sentence Petitioner to the upper term for Count 1 (robbery) and Count 13 (conspiracy to commit robbery). *Id.* at 24–93.

On December 20, 2007, the California Court of Appeal denied all of Petitioner's claims and affirmed Petitioner's conviction and sentence. *Smith*, 2007 WL 4447308.

On January 31, 2008, Petitioner filed a petition for review in the California Supreme Court. ECF No. 50, Ex. 7. On April 9, 2008, the California Supreme Court granted the petition for review and deferred consideration of the case pending the California Supreme Court's disposition of a related case. ECF No. 50, Ex. 8. Then, on August 27, 2008, the California Supreme Court dismissed and remanded the petition. *Id.*

**2. State Habeas Proceedings**

On November 24, 2009, Petitioner filed a state habeas petition in California Superior Court

6

for the County of San Francisco. ECF No. 50, Ex. 9. In that petition, Petitioner raised four new claims: (1) the prosecution failed to share with Petitioner exculpatory evidence related to alleged witnesses Dominic Parella, Steven Parella, and Mohammed Shamim in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) the prosecution offered false evidence at trial in violation of *Napue v. Illinois*, 360 U.S. 264 (1959); (3) Petitioner lacked effective assistance of counsel under the Sixth Amendment; and (4) in the aggregate, the errors created unconstitutional prejudice. *Id.* On March 8, 2010, the Superior Court denied Petitioner's first state habeas petition. *Id.*

On May 4, 2010, Petitioner filed a state habeas petition with the California Supreme Court. ECF No. 50, Ex. 10. On October 12, 2011, the California Supreme Court summarily denied the petition. *Id.*

On December 24, 2012, Petitioner filed a successive habeas petition in the Superior Court of California for the County of San Francisco. ECF No. 50, Ex. 11. Petitioner's successive petition relied on "new *Brady* material that was disclosed after the ruling" on Petitioner's first state court petition for habeas corpus. *Id.* at 3. Specifically, Petitioner contended that he had discovered evidence that Gardner, one of the SFPD officers who investigated the heist and questioned Petitioner in New York, had been disciplined prior to the heist for lying to officers during an internal SFPD investigation. *Id.* at 9. On May 9, 2013, the Superior Court denied Petitioner's successive habeas petition. *Id.* at 11.

On July 15, 2013, Petitioner filed a successive habeas petition in the California Supreme Court. ECF No. 50, Ex. 12. On October 22, 2014, the California Supreme Court summarily denied the successive petition. *Id.*

### 3. Federal Court Proceedings

On November 25, 2009, Petitioner, represented by counsel, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his detention at the California State Prison, Solano, in Vacaville, California. ECF No. 1. The petition was originally assigned to the Honorable James Ware. On January 1, 2010, Judge Ware issued an order for Respondent to show cause why the petition should not be granted and to respond within 60 days. ECF No. 9.

7

On January 28, 2010, Petitioner filed a motion to stay Petitioner's federal habeas petition so that Petitioner could exhaust certain claims in state court. ECF No. 10. Petitioner informed the Court that, as explained above, Petitioner had filed in November 2009 his first state habeas petition in California Superior Court for the County of San Francisco. *Id.* at 3. On February 10, 2010, Respondent filed a statement of non-opposition to Petitioner's motion for a stay of Petitioner's federal habeas petition. ECF No. 11. On March 5, 2010, Judge Ware stayed Petitioner's federal habeas petition pending exhaustion of his claims in state court. ECF No. 12.

On May 15, 2013, Petitioner filed an amended petition for writ of habeas corpus. ECF No. 15 ("Pet."). Petitioner also filed sixty supporting exhibits. ECF Nos. 16 & 17; *see also* ECF No. 19 (corrected version of certain exhibits).[2]

On June 25, 2013, the case was reassigned to the undersigned. ECF No. 20. On August 13, 2015, this Court ordered Respondent to show cause why Petitioner's amended petition should not be granted. ECF No. 27. This Court gave Respondent sixty days, or until October 12, 2015, to file an Answer. *Id.*

On October 12, 2015, Respondent filed an application for extension of time to file a response. ECF No. 29. On October 13, 2015, pursuant to Civil Local Rule 6-3 and Habeas Local Rule 2254-6, this Court granted Respondent's extension request. ECF No. 30. Respondent filed an answer to the petition on December 11, 2015, ECF No. 31, and an accompanying memorandum of points and authorities in support. ECF No. 32 ("Ans."). Respondent also filed forty-seven exhibits in support of the answer. ECF No. 34.

On January 5, 2016, Petitioner moved for a 90-day extension of time to file the traverse, based on a forthcoming motion to withdraw from Petitioner's counsel Geri Lynn Green. ECF No. 35. On January 6, 2016, Green filed an ex parte motion to withdraw, which stated that Green was "ill and unable to continue representing Petitioner." ECF No. 36.

On January 12, 2016, the parties filed a joint stipulation to extend the time for Petitioner to

---

[2] Many pages of the "corrected version" of Petitioner's exhibits are impossible to decipher due to an apparent scanning error. *See* ECF No. 19-1.

1    file a traverse to April 13, 2016.  ECF No. 37.  On January 13, 2016, this Court granted Green's

2    motion to withdraw as Petitioner's counsel and granted the parties' stipulation to extend the time

3    for Petitioner to file a traverse to April 13, 2016.  ECF No. 38.

4         On January 27, 2016, Petitioner filed a financial affidavit titled "Expanded declaration in

5    support of attorney or other services pursuant to the Criminal Justice Act."  ECF No. 40.  On

6    February 21, 2016, this Court construed Petitioner's financial affidavit as a motion for

7    appointment of counsel and denied Petitioner's motion for appointment of counsel.  ECF No. 41.

8         On April 18, 2016, Petitioner filed a motion to extend the time for Petitioner to file a

9    traverse by thirty days.  ECF No. 42.  On April 21, 2016, this Court granted Petitioner's motion to

10   extend the time for Petitioner to file his traverse to May 13, 2016.  ECF No. 44.  On May 18,

11   2016, Petitioner filed another motion to extend the time for Petitioner to file his traverse by thirty

12   days.  ECF No. 45.  On May 20, 2016, this Court granted Petitioner's motion to extend the time to

13   file his traverse to June 13, 2016.  ECF No. 47.

14        On June 17, 2016, Petitioner, proceeding pro se, filed his traverse.  ECF No. 48.

15        On November 15, 2016, Respondent filed a notice informing the Court that the Ninth

16   Circuit had, on October 21, 2016, issued an unpublished disposition in a related case involving

17   Petitioner's brother, *Smith v. Chappell*, 664 F. App'x 621 (9th Cir. 2016).  ECF No. 49.  In

18   *Chappell*, the Ninth Circuit affirmed a district court's denial of Petitioner's brother's federal

19   habeas petition, which had relied on the same undisclosed Gardner evidence Petitioner relies on in

20   his current petition.  664 F. App'x at 625; *see* Traverse at 5 (Petitioner describing non-disclosure

21   of Gardner evidence as "[t]he essence of the First Amended Petition").  On December 23, 2016,

22   Respondent filed additional exhibits.  ECF No. 50.

23   **II.    LEGAL STANDARD**

24        **A. Anti-Terrorism and Effective Death Penalty Act of 1996 (28 U.S.C. § 2254)**

25        Because Petitioner filed his original federal habeas petition in 2009, the Anti-Terrorism

26   and Effective Death Penalty Act of 1996 ("AEDPA") applies to the instant action.  *See Woodford*

27   *v. Garceau*, 538 U.S. 202, 210 (2003).  Pursuant to AEDPA, a federal court may grant habeas

28

United States District Court
Northern District of California

relief on a claim adjudicated on the merits in state court only if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

### 1. Contrary To or Unreasonable Application of Clearly Established Federal Law

As to 28 U.S.C. § 2254(d)(1), the "contrary to" and "unreasonable application" prongs have separate and distinct meanings. *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court."). A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 412-13.

A state court's decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). A state court's determination that a claim lacks merit is not unreasonable "so long as 'fairminded jurists could disagree' on [its] correctness." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Holdings of the United States Supreme Court at the time of the state court decision are the sole determinant of clearly established federal law. *Williams*, 529 U.S. at 412. Although a district court may "look to circuit precedent to ascertain whether [the circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent," *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam), "circuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court." *Kernan v. Cuero*, 138 S. Ct. 4, 9 (2017) (per

10

curiam) (internal quotation marks and citations omitted).

### 2. Unreasonable Determination of the Facts

In order to find that a state court's decision was based on "an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013). That said, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

In examining whether a petitioner is entitled to relief under 28 U.S.C. § 2254(d)(1) or § 2254(d)(2), a federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). In the event that a federal court "determine[s], considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable determination of the facts," the federal court evaluates the petitioner's claim de novo. *Hurles*, 752 F.3d at 778. If error is found, habeas relief is warranted if that error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).

## III. DISCUSSION

Petitioner's amended petition raises nine claims: (1) the prosecution violated *Brady* by

failing to disclose several pieces of evidence before trial, including Gardner's personnel record and information relating to Dominic Parella, Steven Parella, and Mohammed Shamim; (2) the prosecution violated *Napue* by using false testimony; (3) Rutledge, Petitioner's trial counsel, was ineffective; (4) the trial court should not have denied Petitioner's *Miranda* motion to suppress his June 2004 statements to Leydon and Gardner in New York; (5) Petitioner's conviction was not supported by sufficient evidence; (6) the trial court improperly instructed the jury; (7) cumulative error entitles Petitioner to relief; (8) the trial court violated *Faretta* when the trial court rejected Petitioner's request to deliver closing argument in the second phase of the trial; and (9) the trial court committed sentencing error when imposing the upper term. Pet. at 12–17.

At the outset, the Court notes that although Petitioner cites the 28 U.S.C. § 2254(d) standard, Petitioner does not frame his arguments as to specific claims within that standard. Petitioner does not explain how any of the state courts' decisions on any of Petitioner's claims were "contrary to, or involved an unreasonable application" of United States Supreme Court precedent or based on "an unreasonable determination of the facts." 28 U.S.C. § 2254(d). Rather, Petitioner appears to simply allege error by the trial court. *See, e.g.*, Pet. at 67–68 (arguing that prosecution violated *Brady*, not that the Superior Court's decision on Petitioner's *Brady* claim in the successive petition was an unreasonable application of United States Supreme Court precedent). However, this Court's review is not de novo: "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough*, 541 U.S. at 664).

Thus, for each of Petitioner's claims, the Court follows the AEDPA framework and analyzes whether the state court's decision on Petitioner's claim was contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

### A. *Brady* Claims

Petitioner contends that the prosecution failed to disclose evidence favorable to the defense in violation of *Brady*, 373 U.S. 83. Petitioner identifies three categories of alleged *Brady* material:

12

1   (1) personnel records related to Gardner, one of the SFPD officers who investigated the heist and

2   testified at Petitioner's trial, Pet. at 66; (2) information about Dominic Parella's and Steven

3   Parella's involvement with the SFPD, Pet. at 79; and (3) evidence about a man named Mohammed

4   Shamim, Pet. at 82.

5        Under *Brady* and its progeny, the prosecution has a duty to disclose evidence favorable to

6   an accused, and the failure to disclose such evidence violates due process "where the evidence is

7   material either to guilt or to punishment, irrespective of the good faith or bad faith of the

8   prosecution." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Brady*, 373 U.S. at 87). The

9   prosecution's duty under *Brady* encompasses both impeachment evidence and exculpatory

10  evidence. *Id.*; *accord United States v. Bagley*, 473 U.S. 667, 676 (1985). Thus, a *Brady* violation

11  requires showing three components: (1) "The evidence at issue must be favorable to the accused,

12  either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been

13  suppressed by the State, either willfully or inadvertently," and (3) the evidence was material, such

14  that the "result of the trial would have been different" had the evidence been disclosed to the

15  defense *Id.* at 281–82, 289. *Brady* imposes on the prosecution "a duty to learn of any favorable

16  evidence known to the others acting on the government's behalf in this case, including the police."

17  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

18       Withheld evidence is material if "the favorable evidence could reasonably be taken to put

19  the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. In

20  *Kyles*, the United States Supreme Court observed that the Court should look to the "the word of

21  the prosecutor" to understand the "likely damage" of suppressed evidence. *Id.* at 444.

22  "Impeachment evidence is especially likely to be material when it impugns the testimony of a

23  witness who is critical to the prosecution's case." *United States v. Price*, 566 F.3d 900, 913–14

24  (9th Cir. 2009) (quoting *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005)). Thus, for example,

25  the United States Supreme Court has concluded that evidence impeaching the prosecution's sole

26  witness is material. *Smith v. Cain*, 565 U.S. 73, 74, 76 (2012). A state court must consider "the

27  cumulative effect of the suppressed evidence" as part of its materiality analysis. *Barker v.*

28
    13

*Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005) (citing *Kyles*, 514 U.S. at 436–37).

### 1. Gardner Evidence

Petitioner's primary *Brady* claim—and indeed, "the essence of the First Amended Petition," Pet. at 12; Traverse at 5—is that the prosecution failed to disclose evidence that Petitioner could have used to impeach Gardner's testimony.

Most of the Gardner evidence stems from a 1999 SFPD internal investigation. The investigation arose from a scheme to share testing scenarios for an SFPD promotional exam, which was subject to the terms of a consent decree. ECF No. 22, Ex. 6, GARD 217; *see also Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 618 (9th Cir. 1982) (affirming entry of consent decree arising from lawsuit that alleged a "widespread pattern and practice of racial and sexual employment discrimination" at SFPD). Before the exam, SFPD Officer Donald Kosewic—who Gardner was tutoring—told Gardner that Kosewic had received exam scenarios. *Id.* at GARD 219. Gardner then called SFPD's Consent Decree Unit, which was responsible for administering the exam, and anonymously discussed the scenarios with Consent Decree Unit employees. *Id.* at GARD 220. That conversation confirmed to Gardner that the testing scenarios that Kosewic had received were in fact the exam scenarios. *Id.* The Consent Decree Unit later canceled the exam and SFPD began an internal investigation. *Id.* at GARD 221. A federal grand jury also investigated the exam scheme. *Id.* at GARD 225.

The SFPD's internal investigation concluded that Gardner's conduct violated numerous department rules. First, Gardner failed to timely report the leak of the scenarios and was uncivil when speaking with the Consent Decree Unit. *Id.* at GARD 228. Second, after confirming that the leaked scenarios were in fact the exam scenarios, Gardner discussed the scenarios with Officer John Kowal, another officer studying for the exam. *Id.* at 229. Third, Gardner told Kosewic to destroy evidence related to the scenario scheme. *Id.* at GARD 230. Fourth, Gardner lied to SFPD officials during the internal investigation. *Id.* at GARD 231–32. Based on the internal investigation report and Gardner's own admissions, the San Francisco Police Commission ordered Gardner's termination, although Gardner's termination was held in abeyance for five years subject

United States District Court
Northern District of California

1   to good conduct. *Id.* at GARD 210–12. Gardner also received a 90-day suspension effective

2   immediately. *Id.* at GARD 212.[3]

3         Petitioner also relies on an unrelated 1996 complaint lodged against Gardner with the

4   Office of Citizen Complaints ("OCC"), the city agency assigned to investigate complaints against

5   SFPD officers. ECF No. 22-5 (complaint record). Although the handwritten complaint is difficult

6   to read, both Petitioner and Respondent agree that the African-American complainant alleged that

7   Gardner approached the complainant while the complainant was having a drink at a hotel with his

8   white female coworker, told the complainant that the hotel wanted the man to leave the premises,

9   and stated that the complainant was a "pimp." Pet. at 36; Ans. at 23. There is no record of any

10  investigation into the allegations or whether the OCC concluded that the allegations were true.

11        Petitioner only became aware of the above evidence sometime in 2011, well after

12  Petitioner's trial, and after Petitioner had filed his first state habeas petition. ECF No. 50, Ex. 11.

13  Therefore, Petitioner raised the Gardner *Brady* claim in a successive state habeas petition filed in

14  Superior Court. ECF No. 50, Ex. 11.

15        On May 9, 2013, the Superior Court rejected Petitioner's Gardner *Brady* claims. The

16  Superior Court cited the United States Supreme Court's decisions in *Brady*, *Strickler*, and *Cain*.

17  *Id.* at 5–9. Then, the Superior Court discussed the Gardner evidence and other trial evidence

18  against Petitioner. *Id.* at 9–10. Among that trial evidence was Petitioner's statement to Leydon

19  and Gardner that Petitioner "had advised the owner of [Lang's] how to commit a robbery and

20  helped him to plan it," as well as Petitioner's admission that he had received two parking tickets

21  near Lang's while meeting with the owner. *Id.* at 9–10. In addition, SFPD found a laptop in

22  Petitioner's New York apartment on which, shortly after the heist, someone had queried a search

23  engine for crimes committed in San Francisco. *Id.* at 10. Investigators also found in the New

24  York apartment two notes referring to meetings with the Lang's owner and a *San Francisco*

25

26  [3] Relatedly, Petitioner contends that the Gardner evidence demonstrates that Gardner "admitted
    criminal acts" and received immunity in exchange for testifying against others. Pet. 37, 66.

27  However, the record evidence does not support that contention, and shows only that Gardner lied
    during the criminal investigation into the exam scheme. *See* ECF No. 22, Ex. 6, GARD 213.

28
    Case No. 09-CV-05602-LHK
    ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS

*Chronicle* article on the Lang's heist headlined, "Three Men Sought as suspects in $10 Million SF Heist." *Id.*

Then, the Superior Court concluded that the prosecution's failure to disclose the Gardner evidence did not violate *Brady* because the Gardner evidence, considered collectively, was relevant only to impeach Gardner's "general credibility," and was not specific to Petitioner's case. *Id.* at 11. Further, Gardner was not the prosecution's only witness; Leydon also testified about Petitioner's statements in New York. *Id.* Therefore, the Superior Court concluded that given the other evidence of Petitioner's guilt, the Gardner evidence, considered collectively, was not material under *Brady*. *Id.* at 11.

The Superior Court's conclusion was not an unreasonable application of *Brady*. Since *Brady*, the United States Supreme Court has considered several *Brady* claims premised on impeachment evidence. In *Giglio v. United States*, 405 U.S. 150 (1982), the United States Supreme Court addressed the materiality of a cooperation agreement between the government and its "key witness," which provided for the witness's immunity in exchange for a promise to testify for the government. *Id.* at 150–51. The *Giglio* Court held that the impeachment evidence was material because "the Government's case depended almost entirely on [the impeached witness's] testimony; without [the testimony] there could have been no indictment and no evidence to carry the case to the jury." *Id.* at 154.

In *Strickler*, the prosecution failed to disclose a key witness's documents and notes of interviews with the witness that "impeach[ed] significant portions of her testimony." 527 U.S. at 266. The United States Supreme Court concluded that even though the prosecution's closing argument relied in part on the impeached witness's testimony, the petitioner had not established a "reasonable *probability* of a different result" given the other evidence showing that the petitioner was guilty of capital murder. *Id.* at 290–91 (emphasis in original). That evidence included other witness testimony placing petitioner at the crime scene and "considerable forensic and other physical evidence linking petitioner to the crime." *Id.* at 293–94.

Later, in *Banks v. Dretke*, 540 U.S. 668 (2004), the United States Supreme Court held that

16

the prosecution violated *Brady* when it failed to disclose impeachment evidence related to two crucial prosecution witnesses. The prosecution did not disclose "that one of those witnesses was a paid police informant [and] that the other witness'[s] trial testimony had been intensively coached by prosecutors and law enforcement officers." *Id.* at 675. The prosecution itself argued that the informant witness's testimony was "of the utmost significance," and no other witness corroborated the informant witness's testimony. *Id.* at 700. Thus, the *Banks* Court concluded that the informant witness was the "centerpiece" of the prosecution's penalty-phase case, and that the impeachment evidence was material under *Brady*. *Id.* at 701, 703; *see also Cain*, 565 U.S. at 76 (holding that evidence that the "single witness" linking the petitioner to the crime had given contradictory declarations was material impeachment evidence, and should have been disclosed under *Brady*).

The Superior Court's conclusion that the Gardner evidence is not material under *Brady* was not an unreasonable application of the foregoing precedents. In contrast to *Banks* and *Cain*, Gardner was not the sole witness to any of the evidence linking Petitioner to the heist. Also in contrast to the impeachment evidence at issue in *Giglio*, *Strickler*, *Banks*, and *Cain*, the evidence of Gardner's prior discipline bears no relationship to Gardner's participation in Petitioner's case.

Petitioner focuses primarily on Gardner's testimony about Petitioner's statement in New York, as Gardner testified that Petitioner told Leydon and Gardner that Petitioner "wasn't there [during the robbery]; he only helped plan it." RT 1048. After Gardner handed Petitioner a piece of paper with the name "Mark Zimmelman" written on it, Gardner testified that Petitioner then "talked about Mark Zimmelman and how Mark Zimmelman had approached him and told him that he could make a million." RT 1050. Petitioner stated that he, his brother Troy Smith, and Zimmelman had planned the Lang's heist for "months" and confirmed that Petitioner had received two parking tickets near Lang's while meeting with Zimmelman. RT 1050-51. Petitioner never admitted that he was present at Lang's during the robbery. RT 1051.

However, even if Gardner himself had been "entirely discredited," *Strickler*, 527 U.S. at 292, both Leydon and Gardner questioned Petitioner in New York, and the jury could still have

17

concluded that Petitioner told Leydon and Gardner that Petitioner helped plan the heist. At the time of Petitioner's questioning, and until Leydon's eventual promotion to lieutenant, Leydon was the lead officer investigating the Lang's heist. RT 823, 1039. Leydon's testimony in the trial transcript spans 158 pages of the trial transcript, RT 821-978, whereas Gardner's spans only 62 pages. RT 1038-1099. Petitioner points to no evidence impeaching any of Leydon's testimony or Leydon's general credibility.

At trial, Leydon testified that Leydon read Petitioner his *Miranda* rights, and that Petitioner agreed to talk so long as the officers did not record Petitioner's statement or ask him to sign anything. RT 860. Leydon testified that Petitioner "started talking about him and Mr. Zimmelman planning this particular robbery of the store." RT 864. Petitioner told Leydon that Zimmelman had approached Petitioner and told him, "I have a job that is worth millions." RT 865. Leydon also testified that Petitioner testified that he had received two parking tickets near Lang's while meeting with Zimmelman. RT 869. Petitioner maintained that "he was not directly involved and that he had only given advice" for the heist. *Id.* Leydon testified that Petitioner told him that the planning "took about five months." RT 966. Therefore, Leydon also testified about Petitioner's New York statement, which inculpated Petitioner in the conspiracy to commit the Lang's heist. Because, unlike in *Cain*, Gardner was not the "single witness"—or even the primary witness—to Petitioner's admission, the Superior Court's rejection of Petitioner's Brady claim was not unreasonable. 565 U.S. at 76.

In addition, as in *Strickler*, the Superior Court pointed to the "considerable forensic and other physical evidence linking [Petitioner] to the crime." 527 U.S. at 293. In this case, the evidence of Petitioner's guilt—beyond Petitioner's admission that he helped plan the heist—was considerable:

- Four different Lang's employees testified that two black men held the employees at gunpoint, made the employees open the Lang's safes, and bound the employees, RT 403-404 (Beeghly), RT 479 (Frey), RT 596-598 (Gonsalves), RT 650-52 (Martinez);
- One Lang's employee identified Petitioner as one of the robbers, RT 484;
- Petitioner received two parking tickets near Lang's in the months prior to the

18

heist, RT 894;

- A forensic examination of a laptop with the sign-in name "Dino Smith" found in Petitioner's New York apartment revealed that shortly after the heist, a user had searched the Internet for crimes committed in San Francisco, RT 1025-1033;
- Documents found in Petitioner's New York apartment included a note referring to a meeting with "MZ" and a newspaper article about the heist, RT 986;
- Petitioner was found living in New York under the assumed identity "John Williams" and gave police a third name, "Brandal Platt," RT 853, 984;
- Police found in Petitioner's New York storage locker high-quality power tools, RT 1045-1046.

In light of that record, the Superior Court's conclusion that the all of the Gardner evidence, considered collectively, was not material under *Brady* is not an unreasonable application of United States Supreme Court precedent. The Superior Court could reasonably have concluded that, given Leydon's testimony, senior position, and more prominent role at trial, the government's case did not depend "almost entirely" on Gardner's testimony. *Giglio*, 405 U.S. at 154. Even on the fact of Petitioner's New York statement, which was far from the only evidence of Petitioner's participation in the heist, Gardner was not the "centerpiece" of the prosecution's case. *Banks*, 540 U.S. at 701; *see also Chappell*, 664 F. App'x at 623–24 (holding, in Petitioner's brother's case, that even though the Gardner evidence "would have been highly probative impeachment material," the state court could reasonably conclude that the Gardner evidence was not material given "the strength of the evidence against [Petitioner's brother]").

Moreover, *Banks* involved an informant who received immunity in exchange for his testimony in the petitioner's case, *id.* at 675, while *Cain* involved evidence of a key witness's contradictory declarations relating to the petitioner's case. 565 U.S. at 76; *see also Horton v. Mayle*, 408 F.3d 570, 578 (9th Cir. 2005) (holding that evidence of a key witness's leniency deal would have been "powerful and unique impeachment evidence demonstrating that [the witness] had an interest in fabricating his testimony"). Here, the Gardner evidence concerns Gardner's untruthfulness during an unrelated investigation several years prior to the Lang's heist, and an unsubstantiated complaint that Gardner was rude to a citizen even earlier in time. Thus, the Superior Court concluded that because the Gardner evidence affected only Gardner's "general

19

credibility," and did not directly impeach his testimony in Petitioner's case, the prosecution's nondisclosure did not violate *Brady*. ECF No. 50, Ex. 11 at 11. Petitioner is unable to point to any United States Supreme Court precedent that the Superior Court misapplied in so concluding.[4] Indeed, *Giglio*, *Strickler*, *Banks*, and *Cain* all support the Superior Court's determination.

Therefore, the Court concludes that the Superior Court did not unreasonably apply United States Supreme Court precedent when denying Petitioner's Gardner-related *Brady* claim in Petitioner's second state habeas petition.

### 2. Dominic Parella and Steven Parella

Next, Petitioner contends that the prosecution violated *Brady* by failing to disclose evidence that Dominic Parella ("Dominic") and Steven Parella ("Steven") were working as confidential informants, and that Dominic and Steven both received money from Kemper Insurance Company, the company that insured Lang's. Pet. at 78. Much of the evidence concerning Dominic and Steven was disclosed before the trial of Petitioner's brother, Troy Smith ("Troy"), which occurred in 2006, after Petitioner's trial in 2005. ECF No. 17-4, Ex. 59.

After the heist, Kemper, the Lang's insurer, gave Gardner $4,000 to use to pay for information in the Lang's heist. ECF No. 16-2, Ex. 16 at 1398 (transcript from Troy's trial). Gardner's supervisor approved Gardner's use of the Kemper money. *Id.*

Also after the heist, in May or June 2003, Dominic contacted both Lang's and Kemper. ECF No. 17-4, Ex. 59-D at 2. Eventually, Dominic found his way to Leydon and Gardner.

On the morning of June 17, 2003, Dominic called SFPD to tell Leydon that Dominic was going to rent a motel room at the Ocean Park Motel for George Turner, a suspect in the heist. ECF No. 19, Ex. 32 at 1379 (transcript from Troy's trial). Dominic's name was on the room registration card. RT 804 (motel clerk's testimony at Petitioner's trial). Leydon, Gardner, and other SFPD officers then went to the motel to arrest Turner. RT 850. The officers found Turner at

---

[4] Petitioner also appears to contend that the Gardner evidence destroys the credibility of Gardner's testimony about Petitioner's codefendants Troy Smith and George Turner, but neither co-defendant was prosecuted along with Petitioner, nor are Troy and Turner petitioners in the instant case. *See* Pet. 76-78. Therefore, the Court disregards Petitioner's Turner and Troy allegations.

20

the motel with $650,000 worth of Lang's jewelry. *Id.* In the subsequent arrest report, Leydon and Gardner did not identify Dominic as the person who led the officers to Turner, which Gardner attributed to Dominic's desire to remain confidential. ECF No. 19, Ex. 32 at 1381. Leydon and Gardner had received permission from SFPD Captain Kevin Cashman to keep Dominic's identity confidential. *Id.* at 1382.

On June 24, 2003, Leydon, Gardner, and Dominic signed a note that stated:

> Mr. Dominick Parella is working with San Francisco Police Department Inspectors Daniel Leydon and Daniel Gardner on case number: 030406553. There has been no agreement made either in writing or verbally, offering any type of immunity or dismissal of criminal charges in any pending cases filed with the San Francisco District Attorney's Office. This Document stipulates that Mr. Dominick Parella is not authorized to engage in criminal activity in connection with his voluntary assistance in all matters pertaining to this investigation.

ECF No. 16-2, Ex. 15 at 1. Gardner characterized the arrangement as an "informal agreement." ECF No. 16-2, Ex. 16 at 1399. On June 26, 2003, Dominic signed a note stating, "I, Dominic Parrella, received one thousand dollars in cash from the San Francisco Police Department on Thursday June 26, 2003." *Id.* at 2. Gardner photocopied the ten $100 bills that Gardner gave Dominic. *Id.* at 3–5. Gardner testified that Dominic's $1,000 payment came from the Kemper funds Gardner had received to use to investigate the heist. ECF No. 16-2, Ex. 16 at 1397–98. Later, without Gardner's involvement, Kemper gave Dominic approximately $61,000 in additional reward money, equal to 10% of the value of the jewelry recovered from Turner. *Id.* at 1399.

At some point in 2003 after Turner's arrest, Dominic's wife called to tell Gardner that Turner had given Dominic some of the Lang's jewelry, and that Dominic was selling it. ECF No. 16-2, Ex. 16 at 1387. Dominic's wife recanted shortly thereafter. *Id.* Gardner later talked to Dominic's landlord, Susan Woo, who said that she had received some jewelry from Dominic to pay for back rent. *Id.* at 1387–88; ECF No. 16-2, Ex. 17 at 1429–30.

In June 2004, Leydon and Gardner used some of the $4,000 in Kemper funds to pay for Steven to purchase an airplane ticket to New York. ECF No. 16-2, Ex. 17 at 1417. Leydon and Gardner took the next flight to New York after Steven, and then Steven led the officers to

21

Petitioner.  *Id.*  Leydon and Gardner did not document that Steven helped the officers arrest

Petitioner.  *Id.*

In his first state habeas petition, Petitioner raised a *Brady* claim based on the prosecution's

failure to disclose Dominic and Steven, and argued that the two Parellas may have been involved

in the Lang's heist.  ECF No. 50, Ex. 9.  The Superior Court rejected Petitioner's *Brady* claim.  *Id.*

at 11–18.

As to Dominic, the Superior Court first concluded that Petitioner had failed to show that

the prosecution suppressed Dominic's identity because at Petitioner's trial, the clerk at the motel

where George Turner was arrested testified that a person named Dominic Parella registered

Turner's room.  *Id.* at 12.  Thus, Petitioner was aware that Dominic was involved in Turner's

arrest.  *Id.*  Alternatively, the Superior Court concluded that even if the prosecution did not

disclose Dominic, the evidence that Dominic helped police arrest Turner, that Dominic received

Kemper reward money, and that Dominic sold Lang's jewelry he received from Turner did not

demonstrate that Dominic was connected to the heist.  *Id.* at 13.  "At best," the Superior Court

held, "Petitioner showed Dominic Parella was connected to George Turner."  *Id.*  Thus, the

Dominic evidence was not favorable to Petitioner, and did not satisfy the second *Brady* prong.  *Id.*

As to Steven, the Superior Court concluded that the fact that SFPD used Kemper funds to

pay for Steven's flight to New York demonstrated only that Steven knew of Petitioner's location

in New York.  *Id.* at 15.  Petitioner had not explained how the SFPD's use of Kemper reward

money to pay for Steven's flight aided Petitioner's case, such that the Steven evidence was

favorable to petitioner under the second *Brady* prong.  *Id.*  Alternatively, even if the evidence were

favorable to Petitioner, the Superior Court concluded that given Steven's "brief dealings" with

police, Steven's involvement could not have been material.  *Id.*

Further, the Superior Court concluded that the prosecution's failure to disclose the $4,000

Kemper reward fund that Gardner administered did not violate *Brady*.  *Id.* at 17.  Petitioner

contended that he did not know whether SFPD used the funds "to pay witnesses for their

testimony or whether the insurance money gave inappropriate incentive to the officers to 'solve

the crime.'" *Id.* However, the Superior Court concluded that "nothing indicates" that the Kemper money was used for any improper purpose, or to pay for witness testimony. *Id.* at 18.

The Superior Court's rejection of Petitioner's *Brady* claim related to Dominic and Steven was not an unreasonable application of United States Supreme Court precedent or based on an unreasonable determination of the facts. Although the Superior Court's conclusion that Dominic's disclosure at trial did not violate *Brady* is incorrect because *Brady* requires pretrial disclosure, *see United States v. Nagra*, 147 F.3d 875, 881 (9th Cir. 1998), the Superior Court alternatively held that the Dominic and Steven evidence was not favorable to Petitioner, a conclusion that is not an unreasonable application of *Brady*. Petitioner contends that the prosecution never disclosed Dominic and Steven "as material witnesses, confidential informants, or paid informants." Pet. at 79. However, Petitioner never explains how Dominic and Steven offered evidence favorable to Petitioner's case, or how the Superior Court's conclusion to the contrary was unreasonable.

The crux of Petitioner's argument is that because Dominic and Steven might have been involved in the heist, evidence relating to Dominic and Steven could exonerate Petitioner. However, the Superior Court reached a contrary factual determination, and Petitioner does not argue that the Superior Court's contrary conclusion was an "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2). Only "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004). Petitioner identifies no such error.

As to Dominic, the Superior Court found that Petitioner failed to show that police suppressed Dominic's identity and that Petitioner failed "to show any evidence that police considered [Dominic] to be a suspect or that [Dominic] was in any way connected to the jewelry heist." ECF No. 50, Ex. 9 at 13. The Superior Court's determination was not unreasonable. Testimony at Petitioner's trial revealed that Dominic was involved in Turner's arrest, such that Petitioner was aware of Dominic's identity and participation in Turner's arrest. RT 804, 850. The

23

only new, post-trial evidence relating to Dominic was that Turner gave Dominic some of the Lang's jewelry and that the SFPD paid Dominic $1,000 for information leading to Turner's arrest. Petitioner identifies no evidence that Leydon or Gardner considered Dominic a suspect. The agreement between SFPD and Dominic expressly did *not* promise Dominic immunity in exchange for testimony, or otherwise suggest that Dominic was suspected of any crimes.[5] *See* ECF No. 16-2, Ex. 15 at 1. Thus, it was not unreasonable for the Superior Court to determine that the new Dominic evidence only demonstrated that Dominic was connected to Turner, and not to the heist itself.

It was also not unreasonable for the Superior Court to determine that the lone fact that Steven led SFPD to Petitioner "only proves that Steven Parella knew where Petitioner was located many months after the crime, not that Steven Parella had any knowledge of Petitioner's involvement in the jewelry heist." ECF No. 50, Ex. 9 at 14. Petitioner identifies no evidence that Leydon or Gardner considered Steven a suspect in the heist. In addition, Steven was in custody at the time of the heist, and could not have committed the robbery in lieu of Petitioner. ECF No. 50, Ex. 13 at 1437 (transcript from Troy's trial). All Petitioner can do is speculate, but that is not sufficient to overcome the Superior Court's determinations that Dominic and Steven were not suspects and did not possess information helpful to Petitioner. *See Davis v. Woodford*, 384 F.3d 628, 647 (9th Cir. 2004) (holding that "rank speculation" does not call into doubt a state court's factual determinations); *see also Woods v. Sinclair*, 764 F.3d 1109, 1128 & n.10 (9th Cir. 2014) (holding that mere "speculation that an evidentiary hearing might produce testimony or other evidence" helpful to a habeas petitioner does not merit an evidentiary hearing, let alone relief).

Based on those unchallenged factual determinations that Steven and Dominic were not suspects, the Superior Court's conclusion that the Steven and Dominic information was not favorable to Petitioner was not an unreasonable application of United States Supreme Court precedent. *See Runningeagle v. Ryan*, 686 F.3d 758, 770 (9th Cir. 2012) (rejecting a petitioner's

---

[5] The government's answer notes that all of the eyewitnesses identified the Lang's robbers as African American, while both Parellas are Caucasian. Ans. at 18 n.7.

habeas petition that was "based only on speculation" that evidence would be favorable).  Although evidence that a key witness was a confidential informant can impeach that witness, neither Dominic nor Steven testified at Petitioner's trial.  *See Banks*, 540 U.S. at 675–76 (holding that evidence that an "essential prosecution witness" was a paid informant was favorable to the petitioner and material under *Brady*).  Thus, the fact that both Dominic and Steven received payments from Kemper for assisting with the case does not impeach any trial testimony harmful to Petitioner.

Even if the withheld evidence implicated Dominic in the heist, the Ninth Circuit has applied the United States Supreme Court's *Brady* precedents in similar circumstances and concluded that such evidence is not material.  *Tapia v. Roe*, 189 F.3d 1052 (9th Cir. 1999).  In *Tapia*, the petitioner premised his *Brady* claim on a witness's statement that the Ninth Circuit acknowledged "might be construed to support a theory that only [a codefendant] shot one or the other victims."  *Id.* at 1058.  However, the Ninth Circuit held, the statement did not "undermine the conspiracy and aiding and abetting theories under which Tapia was also charged."  *Id.*

Here, Petitioner was explicitly convicted of conspiracy to commit robbery.  CT 525.  In addition, the trial court instructed the jury on an aiding and abetting theory.  CT 478.  The Court of Appeal determined—in a finding Petitioner does not challenge—that at least three men participated in the Lang's heist.  *Smith*, 2007 WL 4447308, at 1–2.  Therefore, as in *Tapia*, the Superior Court could reasonably have concluded that even if Dominic had participated in the heist, his participation did not undermine the jury's finding that Petitioner was guilty of the robbery.  Again, Petitioner does not even attempt to identify a single United States Supreme Court precedent that the Superior Court misapplied.

For all of the above reasons, Petitioner has not demonstrated that the Superior Court's rejection of Petitioner's Parella *Brady* claim was based on an unreasonable determination of the facts or contrary to United States Supreme Court precedent.

### 3.  Mohammed Shamim

Finally, Petitioner contends that the prosecution violated *Brady* by not disclosing until after

25

trial that Mohammed Shamim was a suspect in the heist. Pet. at 82. In 2006, Petitioner's brother's counsel first learned that Gardner had interviewed Shamim in December 2005, months after Petitioner's May 2005 trial. ECF No. 17-3, Ex. 53. In the interview, Shamim admitted to selling some of the stolen Lang's jewelry for a woman named Debbie Warner. ECF No. 17-3, Ex. 53 at 17. However, Shamim's identity had been disclosed to Petitioner before Petitioner's May 2005 trial, in the form of Gardner's investigation reports. *See* ECF No. 16-2, Ex. 18. In a report dated June 24, 2003, Gardner wrote, "receive info re Sammi or Mohammed as poss accomplice to Dino Smith in 459 of rug outlet." *Id.* at 10. The report also included information about Shamim's address and that Shamim had picked up Petitioner's vehicle at an auto repair shop. *Id.* at 11. Petitioner cited that very same Gardner report as an example of what Petitioner knew during trial with respect to another witness. *See* Pet. at 63 (referring to information at ECF No. 16-2, Ex. 18 at 12 as what Petitioner knew at trial). Petitioner also concedes that Petitioner knew of Shamim's identity, but "overlook[ed]" its importance. Pet. at 82.

Petitioner raised his Shamim-related *Brady* claim in his first habeas petition to the Superior Court, which rejected the claim. The Superior Court concluded that Petitioner had not shown that the prosecution suppressed favorable information about Shamim because the police only learned about Shamim's connection to the Lang's heist in December 2005, after the jury convicted Petitioner on June 3, 2005, and thus could not have shared the information with Petitioner before or during his May 2005 trial.

The Superior Court's conclusion was not an unreasonable application of United States Supreme Court precedent. Petitioner argues that the prosecution "failed to disclose the December 2005 videotaped interview of Shamim," but fails to mention that by the time the evidence first existed, Petitioner's conviction was six months old. CT 525 (jury verdict). Petitioner identifies no United States Supreme Court precedent requiring the prosecution to disclose evidence first developed after trial. In addition, the United States Supreme Court has held that *Brady* is "the wrong framework" for assessing the prosecution's obligations post-conviction. *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009); *see also Skinner v. Switzer*, 562

26

U.S. 521, 536 (2011) ("*Brady* announced a constitutional requirement addressed first and foremost to the prosecution's conduct pretrial."). Therefore, the Superior Court's conclusion that the prosecution had no *Brady* obligation to share that December 2005 interview is not an unreasonable application of United States Supreme Court precedent.

Accordingly, the Court denies Petitioner's *Brady* claim.

## B. *Napue* Claim

Petitioner contends, in a section of his amended petition titled "Summary of Claims," that the prosecution "used false, misleading and perjurious testimony" in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). Unlike with Petitioner's other claims, Petitioner includes no argument section addressed to Petitioner's *Napue* claim. Petitioner mentions only that "Petitioner's due process rights were violated when the State allowed Inspector Gardner to testify falsely." Pet. at 87.

Under *Napue*, "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). A conviction obtained through false evidence includes not only perjured testimony, but also false documents or other forms of admissible evidence. *See Napue*, 360 U.S. at 269. A claim under *Napue* will succeed when (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony or evidence was actually false, and (3) the false testimony or evidence was material. *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013).

Petitioner does not specify what Gardner trial testimony was false. In his first state habeas petition, Petitioner argued that the prosecution violated *Napue* with testimony used "to shield from Petitioner, his counsel, and the jury, knowledge of Dominic Parella, Steven Parella, and Mohammed Shamim's involvement in the jewelry heist." ECF No. 50, Ex. 9 at 20. Petitioner also argued that the prosecution knowingly permitted the clerk of the Ocean Park Motel to testify that George Turner rented the room there, when in actuality Dominic rented the room. *Id.* at 21. The Superior Court rejected Petitioner's *Napue* claim. *Id.* at 19–23.

As an initial matter, the Superior Court held that Petitioner failed to identify any false testimony about Dominic, Steven, and Shamim. *Id.* at 20. In addition, Petitioner did not connect Dominic and Steven with the heist outside of Steven's assistance with Petitioner's arrest. *Id.* at 21. The Superior Court concluded that the prosecution could not have used false testimony to conceal the December 2005 Shamim interview because the interview did not occur until *after* Petitioner's trial. *Id.* The Superior Court also rejected Petitioner's claim related to the motel clerk "because there is absolutely no evidence that [the clerk] testified to anything other than what she observed or believed to be true." *Id.* at 22. That the police disagreed with her testimony did not make it false. *Id.* Further, even if the testimony were false, the Superior Court concluded that there was "no reasonable likelihood that the false testimony would have influenced the judgment of the jury." *Id.* Petitioner wished to use the clerk's testimony to impeach the police testimony that Dominic checked Turner into the motel, but the Superior Court held that at most, the disparity "shows that police thought [the clerk] was mistaken in her identification of Turner as the person who rented the room." *Id.* at 22–23.

Before this Court, Petitioner does not contend that the Superior Court's decision rested on an unreasonable determination of the facts or was an unreasonable application of *Napue* or other United States Supreme Court precedent. Petitioner does not even specify what false testimony Gardner offered, nor does Petitioner challenge the Superior Court's conclusion regarding the motel clerk's testimony.

The Court concludes that the Superior Court's rejection of Petitioner's *Napue* claim was not an unreasonable application of *Napue* and its progeny. The Ninth Circuit has held that it is "*not* clearly established that a police officer's knowledge of false testimony may be attributed to the prosecution under *Napue*." *Reid-Campos v. Biter*, 832 F.3d 968, 977 (9th Cir. 2016) (emphasis in original) (citing *Briscoe v. LaHue*, 460 U.S. 325, 326 n.1 (1983)). Petitioner offers no allegation that the *prosecution* knew that the motel clerk's testimony about Turner was incorrect, only that the police thought the elderly motel clerk was "confused" about who rented the room. ECF No. 19, Ex. 32 at 1380 (Gardner testifying at Troy's trial that he thought the motel

clerk was "confused" when she testified at Petitioner's trial). Therefore, even if the motel clerk's testimony was false, the Superior Court reasonably rejected Petitioner's claim because Petitioner failed to show that the *prosecution* knowingly put on false testimony.

In addition, the Superior Court also reasonably concluded that Petitioner's allegations about Gardner's false testimony did not satisfy the first element of *Napue*. The Ninth Circuit has held that a *Napue* claim will succeed when "the testimony (or evidence) was actually false." *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013). Without Petitioner identifying any specific testimony, the Superior Court could not conclude that any testimony was false.

Therefore, to the extent Petitioner has not waived his *Napue* claim, the Superior Court's rejection of Petitioner's claim was not an unreasonable application of *Napue* and its progeny.

### C. Jury Instructions Claim

Petitioner contends that the trial court violated his Sixth and Fourteenth Amendment rights by failing to properly instruct the jury. Pet. at 96.

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. *In re Winship*, 397 U.S. 358, 364 (1970). With respect to jury instructions, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is 'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.'" *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Boyde v. California*, 494 U.S. 370, 378 (1990) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)).

Claims of instructional error in state court jury trials "generally may not form the basis for federal habeas relief." *Gilmore v. Taylor*, 508 U.S. 333, 343–44 (1993). As the United States Supreme Court explained in *Estelle*, a federal court's habeas powers are limited to examining "whether the [challenged] instruction by itself so infected the entire trial that the resulting

United States District Court
Northern District of California

conviction violates due process." 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147). The United

States Supreme Court has "defined the category of infractions that violate 'fundamental fairness'

very narrowly." *Id.* at 73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Jury

instructions "must be evaluated not in isolation but in the context of the entire charge." *Jones v.*

*United States*, 527 U.S. 373, 391 (1999).

Here, Petitioner challenges the trial court's responses to three questions the jury posed

during deliberations. On June 1, 2005, the jury asked, regarding instructions CALJIC 3.00 and

CALJIC 3.01, "[I]f we determine that defendant was not present at the crime scene . . . can we find

he aided and abetted in the crimes and can we find him guilty of counts: 1-4, 7-11, 14?" ECF No.

34-8, CT 512. The trial court responded, "This precise question is answered by CALJIC 3.01. If

you still have questions, please bring that to the attention of the Court." *Id.* In pertinent part,

CALJIC 3.01 reads, "A person who aids and abets the commission of a crime need not be present

at the scene of the crime." CT 478.

Then, on June 2, 2005, the jury asked, "If the jury determines that Zimmelman gave the

defendant permission to enter and take away property from 323 Sutter, can the defendant still be

guilty of Count 11? (Burglary of 323 Sutter)?" CT 513. The trial court responded as follows:

> (1) Yes, if you find that one or more of the alleged victims did not consent to give
> defendant permission to enter and take property from 323 Sutter[;]
>
> (2) No, if you find that Zimmelman and all the alleged victims gave and or consented
> to give defendant permission to enter and take property from 323 Sutter.

CT 514.

Then, later on June 2, 2005, the jury asked, "If the defendant believed all alleged victims

(employees) were party to the crime at the time of providing aid to commit the crime, could the

defendant still be guilty of aiding and abetting in the crime of robbery?" CT 515. The trial court

responded, "See instruction 4.35(A) as modified." CT 516. As modified, CALJIC 4.35(A) reads:

> An act committed or an omission made in ignorance or by reason of a mistake of fact
> which disproves any criminal intent is not a crime. Thus a person is not guilty of a
> crime if he commits an act or omits to act under an actual belief in the existence of

30

certain facts and circumstances which, if true, would make the act or omission lawful. However, if under such assumed state of facts, defendant's actions would still have been unlawful, this defense does not apply.

CT 520.

On June 3, 2005, the jury asked the same question about the effect of Petitioner's belief that the victims were parties to the claim, but specific to the charge for aiding and abetting false imprisonment. CT 517. The jury also asked whether Petitioner would be guilty of "conspiracy of robbery if he believed the agreement included the plan to have all alleged victims to be part of the conspiracy." CT 517. The trial court responded, "(1) See instruction 4.35(B) as modified. (2) See instruction 4.35(A) as modified." CT 518. The modified CALJIC 4.35(B) is identical to the modified CALJIC 4.35(A) above, although the instruction applies to false imprisonment rather than robbery. CT 519.

Petitioner raised his jury instructions claim on direct appeal to the California Court of Appeal, which rejected the claim. Petitioner expressly conceded that "the instructions given by the [trial] court were correct statements of the law regarding mistake of fact." *Id.* at *8. Petitioner contended, as he does here, that the trial court failed to address Petitioner's argument that if Petitioner believed everyone in Lang's at the time of the robbery was part of the conspiracy, Petitioner could not have the specific intent necessary for an aiding and abetting conviction. *Id.* The Court of Appeal concluded that the trial court's responses "adequately informed the jury that . . . appellant would not be guilty if he was acting under a mistake of fact, which if true would make his act lawful; but would be guilty if despite such mistake of fact, his act would still be unlawful." *Id.* at *9.

The Court of Appeal's conclusion was not unreasonable, nor did the trial court's instruction violate fundamental fairness. *See Estelle*, 502 U.S. at 78 (holding that "the fundamental fairness guarantee of the Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the offense"). Petitioner's argument is that even though the trial court's instructions were correct, the trial court did not respond to the jury's question "relating to Petitioner's belief as it affected his specific intent in the conspiracy and aider

31

1  and abettor contexts." Pet. at 98. Petitioner does not propose how the trial court should have

2  instead responded to the jury's questions.

3          Regardless, the jury instructions the trial court cited responded directly to the jury's

4  questions. The jury asked about the legal effect of Petitioner's beliefs about the facts of the heist.

5  *See, e.g.*, CT 515 ("If the defendant believed all alleged victims (employees) were party to the

6  crime at the time of providing aid to commit the crime, could the defendant still be guilty of aiding

7  and abetting in the crime of robbery?"). The instructions that the trial court identified for the jury,

8  CALJIC 4.35(A) and 4.35(B) as modified, both instructed the jury to acquit Petitioner if the jury

9  found that Petitioner acted "under an actual belief in the existence of certain facts and

10  circumstances which, if true, would make the act or omission lawful." CT 520. In turn, CALJIC

11  9.40 defined the elements of robbery as, among others: "A person had possession of property of

12  some value however slight" and "The property was taken against the will of that person." CT 492.

13  Together, the instructions the trial court identified clearly informed the jury that if Petitioner in

14  fact believed that all of the store employees had consented to the heist, the jury should not convict

15  Petitioner.

16          To the extent Petitioner contends the trial court should have offered additional instructions

17  on mistake of law, Petitioner's argument is contradicted by California law. *See People v.*

18  *Beardslee*, 53 Cal. 3d 68, 97 (1991) (rejecting contention that a trial court must "always elaborate

19  on the standard instructions" because a trial court has discretion "to determine what additional

20  explanations are sufficient to satisfy the jury's request for information"). Here, the jury's

21  questions referred to Petitioner's belief about the Lang's employees' knowledge, not Petitioner's

22  belief about the law. *See* CT 517 (asking whether Petitioner could be guilty of conspiracy charge

23  "if he believed the agreement included the plan to have all alleged victims to be part of the

24  conspiracy"). Under *Beardslee*, it was well within the trial court's discretion to limit its response

25  to the mistake of fact instructions, given that the jury asked about the legal effect of Petitioner's

26  potential mistake of fact. Again, Petitioner does not even contest the correctness of the trial

27  court's jury instructions. Under such circumstances, the Court cannot conclude "the [challenged]

28

32

1    instruction by itself so infected the entire trial that the resulting conviction violates due process."

2    *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147).

3          Therefore, the Court denies Petitioner's jury instructions claim.

4          **D. Sufficiency of Evidence Claims**

5          Petitioner contends that the evidence presented in the trial court was insufficient to sustain

6    his convictions in violation of the Fourteenth Amendment.  Specifically, Petitioner contends that

7    the trial evidence did not demonstrate that Petitioner had the specific intent to "commit,

8    encourage, or facilitate the target crime" at the time Petitioner rendered assistance, such that the

9    evidence does not support a conviction for aiding and abetting.  Pet. at 91.  Petitioner also

10   contends that the trial evidence did not support a conviction under a conspiracy theory.  Pet. 93.

11         To sustain a conviction, the prosecution must put forth "evidence necessary to convince a

12   trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson*

13   *v. Virginia*, 443 U.S. 307, 316 (1979); *see Juan H. v. Allen*, 408 F.3d 1262, 1277 (9th Cir. 2005)

14   (granting habeas relief where the state court unreasonably concluded that the evidence supported

15   all elements of a conviction for aiding and abetting first-degree murder).  Evidence is sufficient to

16   support a conviction where, "viewing the evidence in the light most favorable to the prosecution,

17   any rational trier of fact could have the essential elements of the crime beyond a reasonable

18   doubt." *Jackson*, 443 U.S. at 319.

19         On habeas, a federal court's review is even more deferential: the Court may "overturn a

20   state court decision rejecting a sufficiency of the evidence challenge . . . only if the state court

21   decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)

22   (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).  "[T]he only question under *Jackson* is

23   whether the finding was so insupportable as to fall below the threshold of bare rationality."

24   *Coleman v. Johnson*, 566 U.S. 650, 656 (2012) (per curiam).   The United States Supreme Court

25   has "repeatedly held that a state court's interpretation of state law, including one announced on

26   direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."

27   *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

28

United States District Court
Northern District of California

On direct appeal, the California Court of Appeal rejected Petitioner's claim that the evidence did not support Petitioner's conviction. *Smith*, 2007 WL 4447308, at *5–7.

First, the Court of Appeal reviewed California law on aiding and abetting, and held that "aiders and abettors are subject to the same range of punishment as direct perpetrators." *Id.* at *5 (citing *People v. Cook*, 61 Cal. App. 4th 1364, 1371 (1998)). The Court of Appeal explained that a person aids or abets a crime when he, "acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime." *Id.* at *6 (quoting *People v. Beeman*, 35 Cal. 3d 547, 561 (1984) (in bank)). An aider and abettor "need not be present at the scene of the crime." *Id.*

Then, the Court of Appeal pointed to the "ample evidence" supporting Petitioner's conviction under the above aiding and abetting elements: (1) Petitioner told Leydon and Gardner that he helped plan the Lang's robbery; (2) Petitioner told Leydon and Gardner that he had received two parking tickets near Lang's while meeting with Zimmelman; (3) Gonsalves, who was present during the robbery, testified that a person was moving behind the back wall of Lang's during the robbery; (4) security footage showed four men leaving Lang's after the robbery; and (5) Leydon and Gardner found a newspaper article about the heist in Petitioner's room in New York. *Id.* In addition, "[t]he jury was entitled to accept that part of [Petitioner's] statement in which he admitted he helped with the crime, but reject his description of the planned offense as 'insurance fraud' involving 'cooperative victims' of a 'fake robbery.'" *Id.*

Second, the Court of Appeal reviewed California law on conspiracy, and explained that "[c]onspiracy, like aiding and abetting, is an alternate, vicarious means to being convicted as a principal." *Id.* Under California law, "[c]onspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy." *Id.* at *7 (quoting *People v. Bogan*, 152 Cal. App. 4th 1070, 1074 (2007)). In addition, "a defendant may be convicted of conspiracy even though the substantive offense was committed without the defendant's participation." *Id.* (citing *People v. Lee*, 136 Cal.

34

1    App. 4th 522, 529 (2006)).

2        Then, the Court of Appeal rejected Petitioner's contention that Petitioner agreed only to

3    advise Zimmelman, the Lang's owner, "how to pull off a fake robbery." *Id.* The evidence showed

4    that Petitioner "admitted that he and Zimmelman planned the Lang's robbery over a five-month

5    period." *Id.* Thus, "the jury could reasonably have concluded that [Petitioner] conspired to plan

6    the actual robbery with the actual participants, rather than a 'fake' robbery with Zimmelman." *Id.*

7        The Court of Appeal's conclusions do not fall below the threshold of bare rationality, and

8    thus do not merit habeas relief. *Johnson*, 566 U.S. at 656. To begin, the Court of Appeal's

9    interpretation of California law on the elements necessary to convict a petitioner under aiding and

10   abetting and conspiracy theories "binds a federal court sitting in habeas corpus." *Bradshaw*, 546

11   U.S. at 76.

12       Petitioner contends, with respect to liability under both theories, that the evidence failed to

13   show that Petitioner had the specific intent necessary for conviction. For example, Petitioner

14   contends that "[t]he giving of advice on how to commit insurance fraud is insufficient to establish

15   liability as an aider or abettor of the robbery of which he has no knowledge." Pet. at 91.

16   Petitioner also contends that the evidence shows only that Petitioner agreed to commit a "fake

17   robbery," rather than actual robbery. Pet. at 93.

18       However, as the Court of Appeal pointed out, the jury in Petitioner's case was entitled to

19   accept Petitioner's admission that he helped plan the robbery, but to reject Petitioner's description

20   of the scheme as "insurance fraud." *Smith*, 2007 WL 4447308, at *6; *see Jackson*, 443 U.S. at 319

21   (when reviewing a sufficiency of the evidence claim, a federal court sitting in habeas "must

22   presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must

23   defer to that resolution"); *see* RT 864–66 (Leydon testifying that Petitioner told Leydon and

24   Gardner that Zimmelman approached Petitioner to help plan the Lang's robbery). Therefore, the

25   jury could have concluded that Petitioner knew about the planned Lang's robbery, intended to

26   facilitate the robbery, and took acts to encourage the robbery. *Beeman*, 35 Cal. 3d at 561. From

27   that testimony, the jury could also have concluded that Petitioner agreed with his brother, Troy,

28

35

and others to commit the Lang's robbery—regardless of whether Petitioner himself was present at the scene. *Bogan*, 152 Cal. App. 4th at 1074; *see Lee*, 136 Cal. App. 4th at 529 (holding that a defendant need not be present at the scene of the end crime to be liable for conspiracy).

As set forth above, there was also considerable forensic and physical evidence of Petitioner's guilt outside of Petitioner's own statements to police:

- Four different Lang's employees testified that two black men held the employees at gunpoint, made the employees open the Lang's safes, and bound the employees, RT 403-404 (Beeghly), RT 479 (Frey), RT 596-598 (Gonsalves), RT 650-52 (Martinez);
- One Lang's employee identified Petitioner as one of the robbers, RT 484;
- Petitioner received two parking tickets near Lang's in the months prior to the heist, RT 894;
- A forensic examination of a laptop with the sign-in name "Dino Smith" found in Petitioner's New York apartment revealed that shortly after the heist, a user had searched the Internet for crimes committed in San Francisco, RT 1025-1033;
- Documents found in Petitioner's New York apartment included a note referring to a meeting with "MZ" and a newspaper article about the heist, RT 986;
- Petitioner was found living in New York under the assumed identity "John Williams" and gave police a third name, "Brandal Platt," RT 853, 984;
- Police found in Petitioner's New York storage locker high-quality power tools, RT 1045-1046.

Therefore, because Petitioner offers no argument for why the Court of Appeal's conclusion was "objectively reasonable," the Court denies Petitioner's jury instructions claim.

**E.** *Miranda* **Claim**

Petitioner contends that the trial court erred in denying Petitioner's motion to suppress his New York statements to Leydon and Gardner pursuant to *Miranda*, 384 U.S. 436. Petitioner contends that the prosecution did not carry its burden to demonstrate that Petitioner waived his *Miranda* rights. Pet. 94.

In *Miranda*, the United States Supreme Court held that the police must warn a suspect of his right to remain silent, his right to an attorney, and that any statement he makes may be used against him before the suspect's statements during a custodial interrogation can be admitted into evidence. 386 U.S. at 444. However, a suspect may waive his rights. *Id.* at 475. The government bears the burden to demonstrate that "the defendant knowingly and intelligently waived his

privilege against self-incrimination and his right to retained or appointed counsel." *Id.* Whether a defendant's waiver was knowing and intelligent depends on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374 (1979); *accord Edwards v. Arizona*, 451 U.S. 477, 482 (1981). The Ninth Circuit has described the *Butler* test as the relevant clearly established United States Supreme Court precedent relating to a habeas petitioner's *Miranda* waiver claim. *See Juan H.*, 408 F.3d at 1271 (citing and applying *Butler*'s "totality-of-the-circumstances test").

On May 3, 2005, before trial, Petitioner filed a motion in limine to suppress statements he made to Leydon and Gardner after the officers arrested Petitioner in New York in June 2004. CT 281. Petitioner argued in the 20-page motion that Petitioner "asked for an attorney on numerous occasions and refused to speak to the police." CT 282.

On May 5, 2005, the trial court held an evidentiary hearing on Petitioner's motion to suppress. RT 147, 215. The prosecution first called Lieutenant Leydon, who testified that he and Gardner arrested Petitioner on June 3, 2004 at the Howard Beach subway station in Queens, New York. RT 217. Then, Leydon took Petitioner to an interview room at the NYPD station in Chinatown, Manhattan. RT 218. Leydon testified that he read Petitioner his *Miranda* warnings from a department-issued *Miranda* card and that Petitioner indicated he understood his rights. RT 219. Petitioner agreed to talk to the officers, provided that Petitioner "would not be taped and [] would not write or sign anything." *Id.*

According to Leydon, at no time during the 45-minute long interview did Petitioner indicate that he did not want to talk to Leydon and Gardner. RT 220. Petitioner told Leydon and Gardner that Zimmelman, the owner of Lang's, had approached Petitioner with the idea to conduct a fake robbery of Lang's. RT 221-225. According to Leydon, Petitioner maintained that Petitioner was not involved in the Lang's heist, but that Petitioner only provided advice over the course of five months. *Id.* Four days later, once Leydon returned to San Francisco, Leydon wrote a chronological report of investigation memorializing the interview with Petitioner. RT 226.

37

Leydon took no notes during the original New York interview. *Id.*

Petitioner's counsel cross-examined Leydon. RT 230. On cross-examination, Leydon testified that when interviewing suspects in complicated cases, he does not always take notes because "the person is reluctant if he knows you're writing things down" and "[i]t's better to build a rapport, have a conversation." RT 230-231. Leydon felt that Petitioner's interview was "one of those times" where taking notes would be harmful. RT 231. Leydon testified that to the best of his knowledge, the NYPD had no tapes of the interview with Petitioner. RT 231-232. In total, Petitioner's counsel's cross-examination of Leydon occupies 19 pages of the transcript. RT 230-246, 248-249.

Next, the prosecution called Inspector Gardner, who testified that Leydon gave Petitioner his *Miranda* warnings and that Petitioner never asked for an attorney or indicated that he wished to remain silent. RT 250. Petitioner agreed to talk only on the condition that Petitioner "wouldn't be tape-recorded, wouldn't write anything down and wouldn't sign anything." *Id.* Gardner testified that he had reviewed Leydon's notes on the interview and that the report was consistent with Gardner's memory. RT 251. Further, Gardner testified that Leydon and Gardner never conditioned permitting Petitioner to see his kids on whether Petitioner talked to the officers. RT 252. Petitioner's counsel cross-examined Gardner. RT 252-253. On cross-examination, Gardner testified that Petitioner "was very cooperative through the whole process" after his arrest. RT 252.

Petitioner did not testify, but Petitioner's counsel, Jonathan Rutledge, provided oral argument on the motion. Rutledge argued that because Petitioner had previously been a criminal defendant and represented himself, the trial court could not credibly believe that Petitioner would waive his *Miranda* rights. RT 253.

The trial court denied Petitioner's motion to suppress. The trial court stated, "I've heard the sworn testimony from the police officers, who indicated under oath that [Petitioner] did talk to them; that he did not invoke the right to an attorney; not invoke his Miranda rights. He refused to be taped, refused to sign anything." RT 254-255. The trial court further stated, "I have no evidence to the contrary. I would just have to assume that they're lying, and I'm not willing to do

United States District Court
Northern District of California

that. So I will accept their testimony." RT 255. The trial court cited state authorities for the proposition that "imposing conditions such as no tape recorder does not automatically invoke the right to remain silent," and thus denied Petitioner's motion. RT 255.

Petitioner raised the *Miranda* claim on direct appeal, but the California Court of Appeal rejected it. *Smith*, 2007 WL 4447308, at *3–5. Petitioner contended that the trial court should have disbelieved Leydon's and Gardner's version of the facts. *Id.* at *4. However, the Court of Appeal held that the trial court's credibility findings are entitled to deference. *Id.* Further, the Court of Appeal concluded that the record does not support Petitioner's argument that he requested counsel, given that Petitioner presented no evidence. *Id.* at *5. Finally, the trial court "could reasonably accept the credibility of the officers" given that Leydon "reasonably explained his practice regarding the taking of notes during suspect interviews." *Id.*

The Court of Appeal's rejection of Petitioner's *Miranda* claim was not an unreasonable application of clearly established United States Supreme Court precedent. *Butler*, the leading United States Supreme Court case, is apposite here. In *Butle*r, after officers gave the defendant his *Miranda* warnings, the defendant stated, "I will talk to you but I am not signing any form," and then gave inculpatory statements. 441 U.S. at 371. The United States Supreme Court held that while an express statement of waiver "is usually strong proof of the validity of that waiver," waiver may also be "clearly inferred from the actions and words of the person interrogated." *Id.* at 373. The *Butler* Court thus reversed the state court's suppression of the defendant's inculpatory statements. *Id.* at 376.

Here, as in *Butler*, the totality of the circumstances demonstrate that the Court of Appeal's conclusion that Petitioner waived his *Miranda* rights was not unreasonable. Both Leydon and Gardner testified that Petitioner, like the defendant in *Butler*, agreed to talk to the officers subject to certain conditions, which the officers followed. RT 219, 250. The state court was entitled to defer to the trial court's credibility determinations. *People v. Weaver*, 26 Cal. 4th 876, 918 (2001) (holding that under California law, a reviewing court must "defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial

United States District Court
Northern District of California

evidence"). Petitioner did not testify or present evidence that contradicted Leydon and Gardner, nor did Petitioner present any evidence to impeach the officers' credibility.

Given that credibility finding and *Butler*'s recognition that a *Miranda* waiver need not be express, the Court of Appeal could reasonably conclude that Petitioner waived his *Miranda* rights. *See Juan H.*, 408 F.3d at 1272 (upholding state court's finding of waiver where defendant did not expressly state that he waived his *Miranda* rights, but "indicated that he was willing to talk and proceeded to answer questions" about the events in question); *see also Paulino v. Castro*, 371 F.3d 1083, 1087 (9th Cir. 2004) (holding that state court's conclusion that a defendant's responses to questions after *Miranda* warnings constituted waiver was not unreasonable "in light of *Butler*'s admonition that an express statement is not necessary to establish waiver"). Thus, Petitioner has not shown that the Court of Appeal's rejection of Petitioner's *Miranda* claim was an unreasonable application of *Butler*.

Therefore, the Court denies Petitioner's *Miranda* claim.

### F. *Faretta* Claim

Petitioner contends that the state trial court "abused its direction" by denying Petitioner's request to argue a portion of the case. Pet. 100.

A criminal defendant has a Sixth Amendment right to self-representation. *Faretta v. California*, 422 U.S. 806, 832 (1975). That said, a defendant's "right of self-representation is not absolute." *Indiana v. Edwards*, 554 U.S. 164, 171 (2008). A defendant's decision to represent himself and waive the right to counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of securing delay. *Faretta*, 422 U.S. at 835. If a defendant equivocates, he is presumed to have requested the assistance of counsel. *Adams v. Carroll*, 875 F.2d 1441, 1444 (9th Cir. 1989). Generally, to determine whether a request for self-representation was unequivocal, courts consider "the timing of the request, the manner in which the request was made, and whether the defendant repeatedly made the request." *Stenson v. Lambert*, 504 F.3d 873, 882 (9th Cir. 2007). A request for self-representation must be evaluated in context. *Robinson v. Kramer*, 588 F.3d 1212, 1218 (9th Cir. 2009). The determination of whether a petitioner unequivocally

40

requested self-representation is a factual matter, and "federal courts must give significant deference to the trial court's factual findings." *Stenson*, 504 F.3d at 882 (citing 28 U.S.C. § 2254(e)(1)).

Petitioner's trial was divided into two phases. At the first phase, the jury convicted Petitioner on eight counts. CT 525. At the second phase, the jury decided the truth or falsity of certain alleged aggravating circumstances, including Petitioner's prior convictions and the amount taken in the robbery. CT 545. Only one witness testified during the second phase of the trial. RT 1624. After evidence in the second phase, when it was Petitioner's turn to give closing argument, Petitioner's counsel stated, "Your Honor, Mr. Smith requests that he be allowed to argue this portion of the case to the jury, himself." RT 1639. The trial court denied the request: "All right, and I have denied that request. I think it's either Mr. Rutledge is the attorney, or he isn't. He can't pick and choose. In any event, I'm denying the request." *Id.* Petitioner's attorney, Rutledge, then gave closing argument in the second phase. *Id.*

Petitioner raised his *Faretta* claim on direct appeal to the Court of Appeal, which rejected the claim. The Court of Appeal first determined that Petitioner's request to give closing argument was untimely under *Faretta* because Petitioner raised the request during trial. 2007 WL 4447308, at *10. Next, the Court of Appeal concluded that because appellant requested only to argue a "portion" of the case, Petitioner's request for self-representation was equivocal. At no other time in the case did Petitioner indicate "that he wished to either discharge his counsel or represent himself." *Id.* Thus, the Court of Appeal concluded that Petitioner's request was in fact "*not a Faretta* request for self-representation." *Id.* (emphasis added).

The Court of Appeal's decision was not an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d). The Ninth Circuit has held that *Faretta* clearly established that a *Faretta* request is timely if made "weeks before trial." *Burton v. Davis*, 816 F.3d 1132, 1141 (9th Cir. 2016) (internal quotation marks and citation omitted). Thus, the Court of Appeal's conclusion that Petitioner's request was untimely under *Faretta* was reasonable, given that Petitioner only asked to make closing argument in the second phase of the trial—*after* he had

41

already been convicted. *See id.* (holding that a state court's conclusion that a request for self-representation made three days before trial was untimely was not unreasonable under *Faretta*).

Nor was the Court of Appeal's conclusion that Petitioner's request was equivocal, and not in fact a *Faretta* request for self-representation, an unreasonable application of *Faretta*. Petitioner explicitly sought only to argue a "portion" of Petitioner's case, and a very small portion of the case at that. RT 1639. Petitioner identifies no evidence in the record that Petitioner ever requested to *represent* himself; only that Petitioner—through counsel—requested to give closing argument at the second phase of the trial. *See United States v. Mendez-Sanchez*, 563 F.3d 935, 946 (9th Cir. 2009) (holding that a criminal defendant may unequivocally request self-representation by stating, "If I do not get new counsel, I want to represent myself"). Given the absence of any evidence that Petitioner ever requested to self-represent, the Court of Appeal's conclusion that Petitioner had not actually made an unequivocal *Faretta* request was not unreasonable.

Petitioner's primary argument is that the trial court did not conduct a hearing on Petitioner's request to give closing argument in the second phase of the trial. Pet. at 100. However, Petitioner misstates the law. *Faretta* only requires that the state court make a defendant "aware of the dangers and disadvantages of self-representation" before the state court *permits* a defendant to self-represent. *Lopez v. Thompson*, 202 F.3d 1110, 1117 (9th Cir. 2000) (en banc) (quoting *Faretta*, 422 U.S. at 835). Moreover, the Court of Appeal reasonably concluded that Petitioner's request, through counsel, to argue a portion of the case was not actually a *Faretta* request. Thus, because *Faretta* did not apply, no *Faretta* colloquy was required.

Therefore, the Court denies Petitioner's *Faretta* claim.

## G. Ineffective Assistance of Trial Counsel Claims

Petitioner contends that his trial counsel, Jonathan Rutledge, was constitutionally ineffective in violation of *Strickland v. Washington*, 466 U.S. 668 (1984). Specifically, Petitioner contends that Rutledge (1) failed to present evidence in support of Petitioner's *Miranda* suppression motion; (2) failed to object to the trial court's allegedly erroneous jury instructions and responses to jury questions; and (3) failed to adequately investigate Gardner's history or

42

otherwise to produce the *Brady* material discussed in the preceding section. Pet. at 88–90.

In *Strickland*, the United States Supreme Court held that ineffective assistance of counsel is cognizable as a denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance, of counsel. 466 U.S. at 686. To prevail on an ineffective assistance of counsel claim, a petitioner must establish that: (1) his counsel's performance was deficient, i.e., that it fell below an "an objective standard of reasonableness" under prevailing professional norms; and (2) he was prejudiced by counsel's performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688–94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Ultimately, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy" under the circumstances." *Id.* at 689 (internal quotation marks omitted). Moreover, a "doubly" deferential standard of review is appropriate in analyzing ineffective assistance of counsel claims under AEDPA because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential." *Harrington*, 562 U.S. at 105 (internal quotation marks omitted). When 28 U.S.C. § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Petitioner raised his ineffective assistance claims in his first state habeas petition, but the Superior Court rejected the claims. ECF No. 50, Ex. 9. The Superior Court cited *Strickland* and held that for all of Petitioner's ineffective assistance claims, Petitioner "merely claims that counsel's performance was lacking, without providing any actual evidence whatsoever to show that counsel's performance was less than reasonable in any of the outlined areas." *Id.* at 24. Specific to the jury instructions ineffective assistance claim, Petitioner "failed to indicate how the court misdirected the jury and what counsel reasonably should have done to remedy the situation." *Id.* The Superior Court also rejected Petitioner's claim that Rutledge should have pressed the

43

prosecution to turn over *Brady* material "because Petitioner's counsel had no duty to push the prosecution for such information," as *Brady* imposes an independent obligation on the prosecution to disclose material, favorable evidence. *Id.*

Petitioner has not shown that the state court unreasonably applied the *Strickland* standard to reject Petitioner's ineffective assistance claims.

First, regarding Petitioner's *Miranda* motion, Petitioner claims that Rutledge violated *Strickland* by failing to present evidence in support of Petitioner's *Miranda* motion. Petitioner's instant petition suffers from the same deficiencies that the Superior Court identified. Petitioner does not cite any authority showing there is no "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. Nor does Petitioner identify *what* existing evidence Rutledge could have presented.

Most important, the prosecution bears the burden—and a significant one—to demonstrate that a suspect's waiver was knowing and voluntary. *See Miranda*, 384 U.S. at 475 (holding that the prosecution bears the burden "to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel"). Accordingly, to prevail on the *Miranda* suppression motion, Rutledge was not required to present evidence. *See Butler*, 441 U.S. at 373 (holding that a court "must presume that a defendant did not waive his rights; the prosecution's burden is *great*") (emphasis added). Rather, Rutledge could reasonably have attempted to win the suppression motion by discrediting Leydon and Gardner via cross-examination. *See* RT 230-246 (cross-examination of Leydon); RT 252-53 (cross-examination of Gardner). Rutledge's brief in support of Petitioner's motion in limine also heavily emphasized the prosecution's burden. CT 285 (stating, in a header that "the burden is on the prosecution to establish . . . waiver").

Rutledge explained his reasoning in a declaration filed for Petitioner's first habeas petition—a declaration Petitioner chooses to ignore. ECF No. 50, Ex. 14 at 38. In that declaration, Rutledge explained, "I did not proffer [Petitioner's] testimony at the 402 hearing to suppress his statement because I did not see any reason to put him on the stand if I could not

44

impeach Gardner and Leydon's credibility." *Id.* Therefore, given the prosecution's burden, Rutledge's tactical decision not to have Petitioner testify was well within Rutledge's wide discretion. *See Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial."); *see also Soto v. Ryan*, 760 F.3d 947, 980 (9th Cir. 2014) (holding that even a trial attorney's "unquestionably risky" decision whether or not to call a witness did not merit habeas relief under AEDPA).

Second, in a conclusory paragraph devoid of any citations to the record or legal authorities, Petitioner attacks how Rutledge handled the trial court's responses to the questions the jury sent during deliberations. Petitioner contends that Rutledge "lodged appropriate objections and requested appropriate instructions, but in the end acquiesced." Pet. at 90. Petitioner claims that Rutledge should have "continue[d] to request proper instructions." *Id.* Petitioner's claim borders on frivolous. For one, Petitioner claims that Rutledge's actions prevented Petitioner from "enjoy[ing] a remedy through direct appeal." Pet. at 90. However, Rutledge preserved Petitioner's objections for direct appeal, such that the Court of Appeal considered Petitioner's jury instructions claim on direct appeal. *See Smith*, 2007 WL 4447308, at *7–9.

Petitioner also claims prejudice from being "denied the right to have a properly instructed jury." Pet. at 90. The Superior Court reasonably rejected Petitioner's claim because Petitioner failed to show that the trial court improperly instructed the jury. Petitioner does not identify what other instruction Rutledge could have requested. As explained at length above regarding Petitioner's jury instructions claim, the Court of Appeal upheld the trial court's jury instructions on direct appeal, and the Court of Appeal's conclusion was not unreasonable. *Smith*, 2007 WL 4447308, at *7–9. Because the trial court properly instructed the jury, Petitioner cannot claim that it was deficient performance for counsel to fail to continue to raise futile objections. *See Juan H.*, 408 F.3d at 1273 (holding that "trial counsel cannot have been ineffective for failing to raise a meritless objection").

Third, in another conclusory paragraph, Petitioner contends that Rutledge performed

45

deficiently because Rutledge "did not push the prosecution hard enough to produce *Brady*
material, nor did he adequately investigate the credibility of Inspector Gardner." Pet. at 90.
However, under *Brady*, the prosecution has an independent duty to share exculpatory evidence
with the defense. *Agurs*, 427 U.S. at 107 (holding that the prosecution must turn over exculpatory
evidence "even if no request is made"). Petitioner identifies no United States Supreme Court
precedent holding that defense counsel bears a *Brady* duty to "push" for *Brady* disclosures, nor
does Petitioner identify any other actions Rutledge could have taken to investigate Gardner
beyond Rutledge's *Pitchess* motion. Accordingly, because *Brady* imposes a duty only on the
*prosecution* to disclose material exculpatory evidence, the Superior Court's rejection of
Petitioner's *Brady* ineffective assistance claim was not an unreasonable application of *Strickland*.

Therefore, the Court denies Petitioner's *Strickland* claim.

### H. Sentencing

Petitioner contends that the trial court violated the Sixth Amendment by imposing five-
year, upper term sentences on Count 1 (robbery) and on Count 13 (conspiracy to commit robbery).
Pet. at 102.

Under the Sixth Amendment, "[o]ther than the fact of a prior conviction, any fact that
increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a
jury, and proved beyond a reasonable doubt." *Blakely v. Washington*, 542 U.S. 296, 302 (2004)
(quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). The "statutory maximum" for
*Apprendi* purposes is the maximum sentence a judge could impose based solely on the facts
reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory
maximum" is not the sentence the judge could impose after finding additional facts, but rather is
the maximum he or she could impose without any additional findings. *Id.* at 303–04. Claims of
sentencing error are reviewed for harmless error. *Butler v. Curry*, 528 F.3d 624, 648 (9th Cir.
2008) (citing *Washington v. Recuenco*, 548 U.S. 212, 221–22 (2006)). Even if the state court
impermissibly relies on facts not found by the jury, a federal court may only grant habeas relief if
the court has "grave doubt" that a jury would have found the additional facts beyond a reasonable

46

doubt. *Estrella v. Ollison*, 668 F.3d 593, 600 (9th Cir. 2011).

At the first phase of the trial, the jury convicted petitioner of Count 1 (for robbery) and Count 13 (for conspiracy to commit robbery), as well as six other counts. CT 525. The jury also found that Petitioner's robbery was an excessive taking under California Penal Code § 12022.6(a)(4), which is any taking above $2.5 million. *Id.* At the second phase of the trial, the jury found that Petitioner had three prior robbery convictions and that Petitioner took more than $4 million in the robbery. CT 558-560, 564. The jury found not true the prosecution's allegation that the offense involved planning or sophistication. CT 563.

At sentencing, the trial court imposed the five-year, upper term sentence on Petitioner's Count 1 robbery conviction "based upon various aggravating factors, including the fact that the crime was committed with great planning and sophistication; the taking was excessive and constituted a considerable sum of money; your extensive prior prison record; the fact that you have served previous terms in State Prison." RT 19-20. The trial court then doubled that term based on the Count 13 robbery conspiracy conviction, with "the aggravated term [imposed] for the reasons stated previously." RT 20. Based on the jury's finding at phase one that Petitioner took more than $2.5 million, the trial court also imposed a four-year excessive taking enhancement. RT 20.

On direct appeal, Petitioner contended that the trial court erred by relying on the "planning and sophistication" factor because the jury found untrue the planning and sophistication allegation. Petitioner also contended that the trial court could not use the excessive taking factor to reach the upper term because the trial court had already imposed a four-year excessive taking enhancement under California Penal Code § 12022.6(a)(4).

The Court of Appeal rejected Petitioner's claim of sentencing error. *Smith*, 2007 WL 4447308, at *11–12. The Court of Appeal cited the California Supreme Court's decision in *People v. Black*, 41 Cal. 4th 799 (2007) (*Black II*). In *Black II*, the California Supreme Court had held that a "single aggravating circumstance is legally sufficient to render appellant eligible for the upper term." 41 Cal. 4th at 813. Applying *Black II* to Petitioner's direct appeal, the Court of

47

1    Appeal concluded the trial court was entitled to rely on Petitioner's prior prison record, which was

2    "long and extensive," to impose the upper term. 2007 WL 4447308, at *11. Similarly, because

3    Petitioner's extensive prior prison record alone justified the trial court's imposition of an upper

4    term sentence, the Court of Appeal concluded that any error in the trial court's dual consideration

5    of the jury's excessive taking finding was harmless. *Id.* at *12.

6         Petitioner's argument in the instant petition is unclear, given that Petitioner spends pages

7    appearing to contend that the California Supreme Court wrongly decided *Black II* and then argues

8    that the "exceptions set forth in *Black* . . . subsume this Court's holdings in *Apprendi* and its

9    progeny." Pet. at 105. This Court did not decide *Apprendi*; the United States Supreme Court did.

10   Regardless, the essence of Petitioner's argument is the same as that raised on direct appeal: the

11   trial court's imposition of five-year, upper term sentences on Petitioner's Count 1 and Count 13

12   convictions violated the Sixth Amendment. *See* Pet. at 105.

13        However, the Court of Appeal's conclusion to the contrary was not an unreasonable

14   application of *Apprendi* and its progeny. Under *Black II*, a court may permissibly increase a

15   defendant's sentence based on a defendant's prior prison history, even if no jury has found such a

16   fact. The United States Supreme Court has stated that "*[o]ther than the fact of a prior conviction*,

17   any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be

18   submitted to a jury." *Blakely*, 542 U.S. at 302 (emphasis added). In *Kessee v. Mendoza-Powers*,

19   574 F.3d 675 (9th Cir. 2009), the Ninth Circuit held that the scope of *Blakely*'s "prior conviction"

20   exception has not been clearly established. *Id.* at 679. Thus, the Ninth Circuit has held a state

21   court that applied *Black II* and relied on "the increasing seriousness of [a defendant's] prior

22   convictions" to enhance the defendant's sentence did not unreasonably apply *Apprendi*. *Johnson*

23   *v. Ayers*, 434 F. App'x 642, 644 (9th Cir. 2011). Accordingly, in line with *Johnson*, the Court of

24   Appeal's conclusion that the trial court was entitled to enhance Petitioner's sentence based on

25   Petitioner's prior convictions was not contrary to *Apprendi*.

26        Nor does Petitioner's argument that *Black II* was wrongly decided hold water, given Ninth

27   Circuit precedent addressing that question. *See Johnson*, 434 F. App'x at 644 (holding that clearly

28
     Case No. 09-CV-05602-LHK
     ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS

established United States Supreme Court precedent did not contradict *Black II*'s conclusion that the prior conviction exception includes "not only the fact that a prior conviction occurred, but also other related issues that may be determined by examining the record of the prior convictions"); *see also Butler*, 528 F.3d at 643–44 (rejecting a challenge to *Black II* and explaining that a federal court is "bound to accept a state court's interpretation of state law, except in the highly unusual case in which the interpretation is clearly untenable") (internal quotation marks and citation omitted). In this case, the trial court was entitled to rely on *Black II*, and the Court of Appeal's conclusion that Petitioner's prior criminal history supported an upper term sentence was not contrary to clearly established United States Supreme Court precedent.

Therefore, the Court denies Petitioner's *Apprendi* claim.

## I. Cumulative Error

Finally, Petitioner contends that the "cumulative effect of all the trial errors" entitles him to habeas relief. Pet. at 99. The Ninth Circuit recognizes that "[t]he cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (citation omitted). The Ninth Circuit has granted relief only "when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." *Id.* Accordingly, only where cumulative errors render a trial "fundamentally unfair" is habeas relief merited. *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 298, 302–03 (1973)).

Here, however, the Court cannot grant such relief because Petitioner has not satisfied a basic predicate of the cumulative error doctrine: any errors. Where there is no single existing constitutional error, nothing can accumulate to the level of a constitutional violation. *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Therefore, the Court denies Petitioner's cumulative error claim.

## IV. CONCLUSION

For the above reasons, Court DENIES Petitioner's amended petition for writ of habeas

49

corpus.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Having considered the submissions of the parties, the relevant law, and the record in this case, the Court finds that jurists of reason would not find the result in the instant case debatable. Accordingly, the Court does not issue a certificate of appealability.

**IT IS SO ORDERED.**

Dated: March 22, 2019

_____
LUCY H. KOH
United States District Judge